[Civ. No. 19436. Second Dist., Div. One. July 1, 1953.]

JOSEPH J. BERGHOFF et al., Respondents, v. LAW-
RENCE B. KOBLITZ, Appellant.

Sampson H. Miller for Appellant.

John R. Sahanow and Charles M. Groman for Respondents.

SCOTT (Robert H.), J. pro tem.—Defendant and cross-complainant appeals from an adverse judgment in a case which grew out of a lease between the parties. Plaintiff brought suit for declaratory relief, cancellation of lease and return of money deposited. Cross-complainant sought money damages.

In December, 1946, defendant leased to plaintiff certain business real property described as 911-13-15 North La Cienega Boulevard, Los Angeles. It was a one-story building containing eleven or twelve business offices (excepting a three room suite in the rear portion of the building leased to another tenant). The lease included certain furniture and curtains. Its term was for 10 years commencing January 1, 1947, at a total rental of $80,000, payable at $666.67 per month in advance. As security for payment of rent and compliance by lessee with other provisions of the lease, the latter deposited with lessor a $10,000 United States bond, which was to be returned, less deductions, when their relationship ended.

The court found that plaintiff Berghoff had signed the lease and organized the plaintiff corporation which thereafter entered into possession and had paid the rent, although no formal assignment of the lease was made to the corporation. It further found that plaintiffs remained in possession until May 12, 1951, and "on that day both plaintiffs vacated and abandoned said premises and thereupon, before June 1, 1951, surrendered the same to defendant." Rent was paid up to the end of April, 1951. The court further found that "on or before June 1, 1951, the defendant Lawrence B. Koblitz, accepted the surrender of said premises by the plaintiff and elected to and did terminate and cancel said lease," took over the premises and kept plaintiff out.

Finding number VI sets out that prior to May 12, 1951, lessee talked with lessor about getting a new and different tenant to take the place of lessee; that lessor agreed that if lessee could find someone who would take a lease at a satisfactory rental for the balance of the 10-year period, and who would put up security, the lessor would make a new lease and would release lessee and return his deposit; that plaintiff lessee found such a new tenant, told lessor about it and the latter made direct contact with the new party and executed a new lease at a lower rental for the balance of the original 10-year term, completely ignoring plaintiff lessee; that there-

after plaintiff lessee abandoned and surrendered the premises and asked for the return of his deposit, less certain deductions.

The trial court concluded that plaintiff was entitled to return of his deposit and gave judgment accordingly.

Defendant objects to returning the deposit, arguing that the lease has not been terminated and cancelled. He claims that the deficiency in rental for the balance of the term plus expenses will amount to more than the value of the bond deposited as security.

Emphasis is placed upon paragraph 13 of the lease which is as follows:

"13. In the event of any breach of this lease by lessee, then lessor besides other rights or remedies he may have, shall have the immediate right of re-entry and may remove all persons and property from the premises; such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of, lessee. Should lessor elect to re-enter, as herein provided, or should he take possession pursuant to legal proceedings or pursuant to any notice provided for by law, he may either terminate this lease or he may from time to time, without terminating this lease, re-let said premises or any part thereof for such term or terms and at such rental or rentals and upon such other terms and conditions as lessor in his sole discretion may deem advisable with the right to make alterations and repairs to said premises. Rentals received by lessor from such re-letting shall be applied: first, to the payment of any indebtedness, other than rent, due hereunder from lessee to lessor; second, to the payment of rent due and unpaid hereunder; third, to the payment of any cost of such re-letting; and the residue, if any, shall be held by lessor and applied in payment of future rent as the same may become due and payable hereunder. Should such rentals received from such re-letting during any month be less than that agreed to be paid during that month by lessee hereunder, then lessee shall pay such deficiency to lessor. Such deficiency shall be calculated and paid monthly. Lessee shall also pay to lessor, as soon as ascertained, the costs and expenses incurred by lessor in such re-letting. No such re-entry or taking possession of said premises by lessor shall be construed as an election on his part to terminate this lease unless a written notice of such intention be given to lessee or unless the termination thereof be decreed by a court of competent jurisdiction. Notwithstanding any such re-letting without termination, lessor may at any time there-

after elect to terminate this lease for such previous breach. Should lessor at any time terminate this lease for any breach, in addition to any other remedy he may have, he may recover from lessee all damages he may incur by reason of such breach, including the cost of recovering the premises, and including the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term over the then reasonable rental value of the premises for the remainder of the stated term.''

There is abundant evidence that lessee desired and intended that he should terminate his relationship with lessor, that this was communicated to lessor and that plaintiffs actually moved out on May 12, 1951.

Lessor states that he discovered lessee's abandonment of the premises on May 17, 1951. He also was told by lessee on May 21st, that the latter had moved out. Lessor served on lessee (on May 23d) a three days' notice to pay rent or quit and served similar notices on two subtenants of lessee, and on June 1st, filed suit for unlawful detainer against lessee.

 Plaintiff testified at the trial of the case as follows: ''I asked Mr. Koblitz to reduce the rent due to the fact that I could not lease the building at the rentals that were originally leased, and that was when I first took over the building in '47. Mr. Koblitz informed me all along that 'if you will get me another tenant that will take over your lease, and if that tenant is reliable and will put up a security, I will relieve you of your lease. And I will do more: I will lease it to them for less than you are getting it.'

''I asked him to reduce the rent to $500 from the $666, and he said, 'If you produce such a tenant I will let them have it for the $500.' ''

''. . . . . . . . . . .

''. . . I asked Mr. Koblitz again to reduce the rent so that I might be able to rent the building, which was practically vacant with the exception of two tenants. Mr. Koblitz gave me the same reason. He said, 'I will not reduce the rent for you, but if you can get me a good and reliable and responsible tenant I will reduce the rent.'

''At that time my son, who was present, asked Mr. Koblitz, 'If Dad has or will be able to get a new tenant, who will be responsible and will put up the security? Will Dad get his money back?

"And he says, 'Yes. I will even go one better: I will rent to the new tenant for less than what your Dad is paying.'

"And that, of course, was not the first time that Mr. Koblitz told me that."

Plaintiff further testified that on May 12th, he moved out of the premises because the new tenant whom he had secured was going to take the entire building over.

Plaintiff's son testified that he was present when plaintiff and defendant were discussing the matter of a new tenant and stated:

"So I asked him—I butted into the conversation and asked Mr. Koblitz if we did go ahead with the expense of advertising for a tenant would that mean that we would get our security back and our lease would be forgotton, and Mr. Koblitz said Yes, on condition that you get me a reasonable client, that is, one that is trustworthy and one who will put up good security. And then he said, 'I will also give you a selling pitch, something to help you sell the building: If you get such a person under such conditions, I will reduce the rent.' "

Defendant testified that the new tenant was "the result of efforts on the part of Mr. Berghoff."

When lessor served the notice to pay rent or quit on one of the subtenants he said to him: "Don't pay any attention to that. You can remain here as long as you please. The purpose of that is to get rid of the master lease."

During the same month of May defendant told another subtenant concerning payment of rent: "Make out the check to me for next month." The subtenant then testified, "He told us he was breaking the lease with Berghoff, and Berghoff wouldn't be there anymore."

This announced intention of lessor coupled with the parties' words and acts led the trial court to conclude that the lease was cancelled and terminated on or before June 1, 1951, even though the lease with the new tenant was dated a few weeks later. Subsequent conduct supported this determination. Alterations were made in the premises by lessor. The new lease with new tenant provided not only monthly rental (for an amount less than that paid by plaintiff, but in excess of $500) but also for a deposit for security; gave the new tenant the right to acquire title to all items of furniture and curtains, which right he had previously given plaintiff, and lessor agreed to indemnify the new tenant for loss because of any claim by plaintiff against the new lessee.

Having secured a new tenant and having a new lease and

thus having received all the benefits from the executed oral agreement with plaintiff, defendant nevertheless refused to complete his part of the bargain and declined to return to plaintiff the balance of the deposit. Plaintiff filed complaint in this case as above noted.

After this action was started by plaintiff, defendant filed a cross-complaint asking a money judgment for the difference in rent for the entire balance of the rental period with credit allowed for the unused value of the bond deposited as security. This may be regarded as a further indication by lessor (Civ. Code, § 3308) that he had terminated his lease with plaintiff.

In the notices to quit, above referred to, lessor added, "The undersigned expressly reserves all rights, including the right of forfeiture, inuring to lessor, contained in the lease agreement under which you occupy the herein described premises." Those words were not of sufficient force to overcome the effect of the other words and acts of the parties. In the view of the trial court they in no way enlarged or extended defendant's rights.

Defendant seeks relief on this appeal in reliance on the language of the lease as though the parties had not by agreement cancelled and terminated it. The determination of the trial court, as embraced within its findings, and explained in part by its memorandum of decision, is supported by the evidence in the case viewed in the light of established principles of law.

We observe that lessor did not need to serve a notice to pay rent or quit and to bring an action of unlawful detainer to acquire the right to occupancy of the premises which he had under the lease. His purpose in doing these further acts was to obtain exclusive possession and as he explained to the subtenant, "to get rid of the master lease." The new tenant whom plaintiff had procured was a substantial concern, and in order that lessor might deal freely and without regard for plaintiff, it was obviously to lessor's advantage to be completely free to act without consulting plaintiff. The trial court found upon sufficient evidence that he did so act.

We have considered the various cases upon which counsel rely as supporting their respective positions. In *Yates* v. *Reed*, 36 Cal.2d 383 [224 P.2d 8], the court indicated that when the conduct of the parties is inconsistent with the rights of the tenant under the lease, a surrender of the lease by operation of law may result. (Citing *Welcome* v. *Hess,* 90 Cal. 507 [27 P. 369, 27 Am.St.Rep. 145], and referring to

*De Hart* v. *Allen,* 26 Cal.2d 829 [161 P.2d 453].) A similar situation and ruling are found in *Narcisi* v. *Reed,* 107 Cal. App.2d 586 [237 P.2d 558].

In the case before us, reliance is placed on agreement of the parties by which the lease and the rights of both parties thereunder were at an end because of their own words and acts and not by operation of law. (See *Dorcich* v. *Time Oil Co.,* 103 Cal.App.2d 677 [230 P.2d 10].)

In *Dickinson* v. *Electric Corp.,* 10 Cal.App.2d 207, 210 [51 P.2d 205], judgment for plaintiff lessor was affirmed. The comment is made that when a lessee has surrendered demised premises prior to the termination of the lease *"if the lessor does not desire to proceed further against the lessee he may accept the surrender, treat the lease as terminated and retake possession of the premises,"* or may pursue one of two other remedies, one of which was selected in that case and pursued to judgment. Factually, that case must be distinguished from the instant case because here we have an added factor in the express finding by the trial court that lessor had agreed that it would and it did follow the course indicated by the language in italics above, because plaintiff, the first lessee, got for his lessor a satisfactory new tenant who leased the premises at a lower rental and put up satisfactory security. When the oral agreement between the parties had been fully executed, the lease between them was at an end and plaintiff was entitled to the return of his deposit.

Judgment affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied July 20, 1953, and appellant's petition for a hearing by the Supreme Court was denied August 27, 1953.